**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 13-453-SLR |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| TOSHIBA CORPORATION, TOSHIBA AMERICA, INC., TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC., and TOSHIBA AMERICA INFORMATION SYSTEMS, INC., | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| TOSHIBA CORPORATION and TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC., | ) ) ) ) | |
| Counterclaim-Plaintiffs, v. | ) ) ) | |
| INTELLECTUAL VENTURES I LLC, INTELLECTUAL VENTURES II LLC, INTELLECTUAL VENTURES MANAGEMENT, LLC, INVENTION INVESTMENT FUND I, L.P., and INVENTION INVESTMENT FUND II, LLC, | ) ) ) ) ) ) ) ) | |
| Counterclaim-Defendants. | ) ) | |

**DEFENDANT TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.'S
AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS;
<u>DEMAND FOR JURY TRIAL</u>**

Defendant Toshiba America Electronic Components, Inc. ("TAEC" or "Toshiba") files

this Amended Answer to the Complaint of Plaintiffs Intellectual Ventures I LLC and Intellectual

Ventures II LLC (collectively "IV").   TAEC hereby responds to each numbered paragraph in IV's Complaint as follows:

### The Parties

1.      TAEC is without sufficient information or belief to admit or deny the allegations of this paragraph and, on that basis, denies them.

2.      TAEC is without sufficient information or belief to admit or deny the allegations of this paragraph and, on that basis, denies them.

3.      TAEC admits that Toshiba Corporation ("Toshiba Corp.") is a Japanese corporation with a principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.   Except as specifically admitted, TAEC denies the remaining allegations of this paragraph.

4.      TAEC admits that Toshiba America, Inc. ("TAI") is a Delaware corporation with a principal place of business at 1251 Avenue of the Americas, New York, NY 10020.   TAEC admits that TAI is a holding company.   Except as specifically admitted, TAEC denies the remaining allegations of this paragraph.

5.      TAEC admits that it is a California corporation with a principal place of business at 9740 Irvine Boulevard, Irvine, California 92612.   TAEC admits that it is a subsidiary of TAI. Except as specifically admitted, TAEC denies the remaining allegations of this paragraph.

6.      TAEC admits that Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with a principal place of business at 9740 Irvine Boulevard, Irvine, California 92618.   TAEC admits that TAIS is a subsidiary of TAI.   Except as specifically admitted, TAEC denies the remaining allegations of this paragraph.

7.      TAEC admits that TAI is a holding company.  TAEC admits that it offers flash memory-based storage solutions, solid state drives (SSDs), hard disk drives (HDDs), optical disk drives (ODDs), discrete devices, displays, medical tubes, ASICs/custom SoCs, microprocessors, microcontrollers and wireless components for the computing, wireless, networking, automotive and digital consumer markets.  TAEC admits that TAIS provides consumer electronics products and solutions, including laptops, televisions, blu-ray and DVD players, imaging products for the security, medical and manufacturing markets, storage products for computers, and business telephone systems.  Except as specifically admitted, TAEC denies the remaining allegations of this paragraph.

8.      Denied.

## Nature Of The Action

9.      TAEC admits that IV is asserting a claim of infringement of ten United States patents.  Except as specifically admitted, TAEC denies the remaining allegations of this paragraph.

## Jurisdiction And Venue

10.      TAEC admits that this Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a) to the extent that IV is able to demonstrate a proper claim for patent infringement.  Except as specifically admitted, TAEC denies the remaining allegations of this paragraph.

11.      For purposes of this action, TAEC admits that venue is proper in this district.  Except as specifically admitted, TAEC denies the remaining allegations of this paragraph.

12.      This paragraph contains characterizations and legal conclusions, to which no response is necessary.  However, to the extent the allegations in this paragraph are deemed factual, TAEC denies the allegations of this paragraph and specifically denies that Toshiba

Corp., TAI, TAEC and TAIS have acted jointly and collectively to make, use, distribute, market, sell, offer for sale, import, and/or induce the use of infringing flash memory products, USB host controller products, microcontroller products, and/or hard drive products, and/or material parts thereof.

**The Patents-In-Suit**

13.     TAEC admits that on March 19, 1996, the USPTO issued United States Patent No. 5,500,819 ("the '819 patent"), entitled "Circuits, Systems and Methods For Improving Page Accesses And Block Transfers In A Memory System."  TAEC admits that a copy of the '819 patent was attached as Exhibit A to the Complaint.  TAEC is without sufficient information or belief to admit or deny the remaining allegations of this paragraph and, on that basis, denies them.

14.     TAEC admits that on October 22, 1996, the USPTO issued United States Patent No. 5,568,431 ("the '431 patent"), entitled "Memory Architecture And Devices, Systems And Methods Utilizing The Same."  TAEC admits that a copy of the '431 patent was attached as Exhibit B to the Complaint.  TAEC is without sufficient information or belief to admit or deny the remaining allegations of this paragraph and, on that basis, denies them.

15.     TAEC admits that on February 4, 1997, the USPTO issued United States Patent No. 5,600,606 ("the '606 patent"), entitled "Low Pin Count – Wide Memory Devices Using Non-Multiplexed Addressing And Systems And Methods Using The Same."  TAEC admits that a copy of the '606 patent was attached as Exhibit C to the Complaint.  TAEC is without sufficient information or belief to admit or deny the remaining allegations of this paragraph and, on that basis, denies them.

16.     TAEC admits that on November 11, 1997, the USPTO issued United States Patent No. 5,687,132 ("the '132 patent"), entitled "Multiple-Bank Memory Architecture And Systems And Methods Using The Same."   TAEC admits that a copy of the '132 patent was attached as Exhibit D to the Complaint.   TAEC is without sufficient information or belief to admit or deny the remaining allegations of this paragraph and, on that basis, denies them.

17.     TAEC admits that on December 23, 1997, the USPTO issued United States Patent No. 5,701,270 ("the '270 patent"), entitled "Single Chip Controller-Memory Device With Interbank Cell Replacement Capability And A Memory Architecture And Methods Suit[a]ble For Implementing The Same."   TAEC admits that a copy of the '270 patent was attached as Exhibit E to the Complaint.   TAEC is without sufficient information or belief to admit or deny the remaining allegations of this paragraph and, on that basis, denies them.

18.     TAEC admits that on October 27, 1998, the USPTO issued United States Patent No. 5,829,016 ("the '016 patent"), entitled "Memory System With Multiplexed Input-Output Port And Systems And Methods Using The Same."   TAEC admits that a copy of the '016 patent was attached as Exhibit F to the Complaint.   TAEC is without sufficient information or belief to admit or deny the remaining allegations of this paragraph and, on that basis, denies them.

19.     TAEC admits that on May 2, 2000, the USPTO issued United States Patent No. 6,058,045 ("the '045 patent"), entitled "Serial Flash Memory."   TAEC admits that a copy of the '045 patent was attached as Exhibit G to the Complaint.   TAEC is without sufficient information or belief to admit or deny the remaining allegations of this paragraph and, on that basis, denies them.

20.     TAEC admits that on August 17, 1999, the USPTO issued United States Patent No. 5,938,742 ("the '742 patent"), entitled "Method For Configuring An Intelligent Low Power

Serial Bus."   TAEC admits that a copy of the '742 patent was attached as Exhibit H to the Complaint.   TAEC is without sufficient information or belief to admit or deny the remaining allegations of this paragraph and, on that basis, denies them.

21.     TAEC admits that on November 16, 2010, the USPTO issued United States Patent No. 7,836,371 ("the '371 patent"), entitled "On-Chip Service Processor."   TAEC admits that a copy of the '371 patent was attached as Exhibit I to the Complaint.   TAEC is without sufficient information or belief to admit or deny the remaining allegations of this paragraph and, on that basis, denies them.

22.     TAEC admits that on September 9, 2003, the USPTO issued United States Patent No. 6,618,788 ("the '788 patent"), entitled "ATA Device Control Via A Packet-Based Interface."   TAEC admits that a copy of the '788 patent was attached as Exhibit J to the Complaint.   TAEC is without sufficient information or belief to admit or deny the remaining allegations of this paragraph and, on that basis, denies them.

23.     No response is required in response to this paragraph.

24.     TAEC is without sufficient information or belief to admit or deny the allegations of this paragraph and, on that basis, denies them.

25.     TAEC is without sufficient information or belief to admit or deny the allegations of this paragraph and, on that basis, denies them.

## COUNT I

26.     TAEC incorporates by reference its responses to paragraphs 1 through 25 as if fully set forth herein.

27.     Denied.

28.     Denied.

29.     Denied.

30.     TAEC admits that it received knowledge of the '819 patent through the service of the complaint in this action.  Except as specifically admitted, TAEC denies the allegations of Paragraph 30 as they pertain to TAEC.  TAEC is without sufficient information or belief to admit or deny the allegations of Paragraph 30 as to Toshiba Corp., TAIS and TAI and, on that basis, denies them.

31.     Denied.

32.     Denied.

33.     Denied.

34.     No response to this paragraph is necessary pursuant to the Court's September 3, 2014 order dismissing IV's willful infringement claims.

35.     Denied.

## COUNT II

36.     TAEC incorporates by reference its responses to paragraphs 1 through 35 as if fully set forth herein.

37.     Denied.

38.     Denied.

39.     Denied.

40.     TAEC admits that it received knowledge of the '431 patent through the service of the complaint in this action.  Except as specifically admitted, TAEC denies the allegations of Paragraph 40 as they pertain to TAEC.  TAEC is without sufficient information or belief to admit or deny the allegations of Paragraph 40 as to Toshiba Corp., TAIS and TAI and, on that basis, denies them.

41.     Denied.

42.     Denied.

43.     Denied.

44.     No response to this paragraph is necessary pursuant to the Court's September 3, 2014 order dismissing IV's willful infringement claims.

45.     Denied.

## COUNT III

46.     TAEC incorporates by reference its responses to paragraphs 1 through 45 as if fully set forth herein.

47.     Denied.

48.     Denied.

49.     Denied.

50.     TAEC admits that it received knowledge of the '606 patent through the service of the complaint in this action.  Except as specifically admitted, TAEC denies the allegations of Paragraph 50 as they pertain to TAEC.  TAEC is without sufficient information or belief to admit or deny the allegations of Paragraph 50 as to Toshiba Corp., TAIS and TAI and, on that basis, denies them.

51.     Denied.

52.     Denied.

53.     Denied.

54.     No response to this paragraph is necessary pursuant to the Court's September 3, 2014 order dismissing IV's willful infringement claims.

55.     Denied.

## COUNT IV

56.     TAEC incorporates by reference its responses to paragraphs 1 through 55 as if fully set forth herein.

57.     Denied.

58.     Denied.

59.     Denied.

60.     TAEC admits that it received knowledge of the '132 patent through the service of the complaint in this action.  Except as specifically admitted, TAEC denies the allegations of Paragraph 60 as they pertain to TAEC.  TAEC is without sufficient information or belief to admit or deny the allegations of Paragraph 60 as to Toshiba Corp., TAIS and TAI and, on that basis, denies them.

61.     Denied.

62.     Denied.

63.     Denied.

64.     No response to this paragraph is necessary pursuant to the Court's September 3, 2014 order dismissing IV's willful infringement claims.

65.     Denied.

## COUNT V

66.     TAEC incorporates by reference its responses to paragraphs 1 through 65 as if fully set forth herein.

67.     Denied.

68.     Denied.

69.     Denied.

70.     TAEC admits that it received knowledge of the '270 patent through the service of the complaint in this action.  Except as specifically admitted, TAEC denies the allegations of Paragraph 70 as they pertain to TAEC.  TAEC is without sufficient information or belief to admit or deny the allegations of Paragraph 70 as to Toshiba Corp., TAIS and TAI and, on that basis, denies them.

71.     Denied.

72.     Denied.

73.     Denied.

74.     No response to this paragraph is necessary pursuant to the Court's September 3, 2014 order dismissing IV's willful infringement claims.

75.     Denied.

## COUNT VI

76.     TAEC incorporates by reference its responses to paragraphs 1 through 75 as if fully set forth herein.

77.     Denied.

78.     Denied.

79.     Denied.

80.     TAEC admits that it received knowledge of the '016 patent through the service of the complaint in this action.  Except as specifically admitted, TAEC denies the allegations of Paragraph 80 as they pertain to TAEC.  TAEC is without sufficient information or belief to admit or deny the allegations of Paragraph 80 as to Toshiba Corp., TAIS and TAI and, on that basis, denies them.

81.     Denied.

82. Denied.

83. Denied.

84. No response to this paragraph is necessary pursuant to the Court's September 3, 2014 order dismissing IV's willful infringement claims.

85. Denied.

## COUNT VII

86. TAEC incorporates by reference its responses to paragraphs 1 through 85 as if fully set forth herein.

87. Denied.

88. Denied.

89. Denied.

90. TAEC admits that it received knowledge of the '045 patent through the service of the complaint in this action. Except as specifically admitted, TAEC denies the allegations of Paragraph 90 as they pertain to TAEC. TAEC is without sufficient information or belief to admit or deny the allegations of Paragraph 90 as to Toshiba Corp., TAIS and TAI and, on that basis, denies them.

91. Denied.

92. Denied.

93. Denied.

94. No response to this paragraph is necessary pursuant to the Court's September 3, 2014 order dismissing IV's willful infringement claims.

95. Denied.

## COUNT VIII

96.     TAEC incorporates by reference its responses to paragraphs 1 through 95 as if fully set forth herein.

97.     Denied.

98.     Denied.

99.     Denied.

100.     TAEC admits that it received knowledge of the '742 patent through the service of the complaint in this action.  Except as specifically admitted, TAEC denies the allegations of Paragraph 100 as they pertain to TAEC.  TAEC is without sufficient information or belief to admit or deny the allegations of Paragraph 100 as to Toshiba Corp., TAIS and TAI and, on that basis, denies them.

101.     Denied.

102.     Denied.

103.     Denied.

104.     No response to this paragraph is necessary pursuant to the Court's September 3, 2014 order dismissing IV's willful infringement claims.

105.     Denied.

## COUNT IX

106.     TAEC incorporates by reference its responses to paragraphs 1 through 105 as if fully set forth herein.

107.     Denied.

108.     Denied.

109.     Denied.

110.     TAEC admits that it received knowledge of the '371 patent through the service of the complaint in this action.  Except as specifically admitted, TAEC denies the allegations of Paragraph 110 as they pertain to TAEC.  TAEC is without sufficient information or belief to admit or deny the allegations of Paragraph 110 as to Toshiba Corp., TAIS and TAI and, on that basis, denies them.

111.     Denied.

112.     Denied.

113.     Denied.

114.     No response to this paragraph is necessary pursuant to the Court's September 3, 2014 order dismissing IV's willful infringement claims.

115.     Denied.

## COUNT X

116.     TAEC incorporates by reference its responses to paragraphs 1 through 115 as if fully set forth herein.

117.     Denied.

118.     Denied.

119.     Denied.

120.     TAEC admits that it received knowledge of the '788 patent through the service of the complaint in this action.  Except as specifically admitted, TAEC denies the allegations of Paragraph 120 as they pertain to TAEC.  TAEC is without sufficient information or belief to admit or deny the allegations of Paragraph 120 as to Toshiba Corp., TAIS and TAI and, on that basis, denies them.

121.     Denied.

122.   Denied.

123.   Denied.

124.   No response to this paragraph is necessary pursuant to the Court's September 3, 2014 order dismissing IV's willful infringement claims.

125.   Denied.


## Prayer For Relief

TAEC denies that IV is entitled to any relief, and specifically denies all of the allegations and requests for relief contained in paragraphs A through D of its Prayer for Relief.

### Demand For Jury Trial

No response is required for IV's demand for a jury trial.

### AFFIRMATIVE DEFENSES

TAEC, without waiver, limitation, or prejudice, hereby asserts the following defenses:

### First Affirmative Defense

### (Failure to State A Claim)

With respect to each purported claim for relief alleged in the Complaint, IV fails to state a claim against TAEC upon which relief may be granted.

### Second Affirmative Defense

### (Non-Infringement)

TAEC does not and has not infringed any valid claim of the '819 patent, '431 patent, '606 patent, '132 patent, '270 patent, '016 patent, '045 patent, '742 patent, '371 patent or '788 patent, either directly, contributorily, by way of inducement, literally, and/or under the doctrine of equivalents, willfully or otherwise.

## **Third Affirmative Defense**

## **(Invalidity)**

One or more claims of the '819 patent, '431 patent, '606 patent, '132 patent, '270 patent, '016 patent, '045 patent, '742 patent, '371 patent and '788 patent that allegedly are infringed by TAEC are invalid for failure to comply with one or more of the conditions of patentability set forth in Title 35 of the United States Code including, but not limited to, Sections 101, 102, 103 and/or 112.

## **Fourth Affirmative Defense**

## **(Prosecution History Estoppel)**

One or more claims of the '819 patent, '431 patent, '606 patent, '132 patent, '270 patent, '016 patent, '045 patent, '742 patent, '371 patent and '788 patent are and were limited by amendment, the prior art and/or by the statements made during their prosecution before the United States Patent and Trademark Office such that IV is now estopped and/or otherwise precluded from maintaining that such claims of the '819 patent, '431 patent, '606 patent, '132 patent, '270 patent, '016 patent, '045 patent, '742 patent, '371 patent and '788 patent are of sufficient scope to cover the products accused of infringement in this case either literally or under the doctrine of equivalents.

## **Fifth Affirmative Defense**

## **(FRAND License)**

To the extent that the IV patents are essential to any standard and to the extent any of the alleged inventions described in and allegedly covered by those IV patents are used, manufactured, or sold by or for TAEC, its suppliers, and/or its customers, TAEC has the irrevocable right to be licensed on FRAND terms under those patents.

**Sixth Affirmative Defense**

**(Limitation on Damages)**

TAEC alleges on information and belief that any claim for damages for patent infringement is limited at a minimum by 35 U.S.C. § 287 to only those damages occurring after the notice of infringement and, in any event, by 35 U.S.C. § 286.

**Seventh Affirmative Defense**

**(28 U.S.C. § 1498)**

On information and belief, IV's claims against TAEC for patent infringement are barred, in whole or in part, by 28 U.S.C. § 1498.

**Eighth Affirmative Defense**

**(Costs Barred)**

IV's claim for costs is barred and/or limited by 35 U.S.C. § 288.

**Ninth Affirmative Defense**

**(License)**

On information and belief, TAEC has a license or an implied license to at least the '371 patent.

**Tenth Affirmative Defense**

**(Lack of Standing)**

On information and belief, IV lacks standing to bring a patent infringement action based on any alleged infringement of at least the '371 patent and/or has failed to join a necessary party under Fed. R. Civ. P. 19.

## <u>Eleventh Affirmative Defense</u>

### <u>(Patent Misuse)</u>

1.      Patent misuse renders the asserted claims of the Patents-in-Suit unenforceable. Individually and in combination with its affiliates and other entities, IV has engaged and is continuing to engage in a scheme to impermissibly broaden the physical and temporal scope of the Patents-in-Suit, and of a patent portfolio that includes the Patents-in-Suit, with anticompetitive purpose and effect.

## I.      IMPERMISSIBLE PACKAGE LICENSING

2.      IV engages in an unlawful package licensing scheme, one aspect of which is aggregating patents into large portfolios that it will only license as a portfolio.   In one manifestation of this strategy, IV has compelled and sought to compel Toshiba and other licensees and potential licensees to take and pay for licenses to irrelevant and unwanted patents ("Tied Patents") as a condition for obtaining licenses to one or more of the Patents-in-Suit and to over 3,700 related patents, which IV claims read on flash memory, system on chip (SoC), USB host controller, and hard drive products and potential redesigned alternatives to those products ("Tying Patents").

3.      IV's victims do not want a license to the Tying Patents, and certainly not all of them, for their merits, *i.e.,* because those patents are valid, infringed and not already licensed. Were it not prohibitively expensive to litigate these issues hundreds or thousands of times, litigating the patents would establish that IV's victims do not need these licenses.  Rather, IV's victims are made to "want" a license to the Tying Patents because IV bases its unlawful patent portfolio hold-up campaign (which is described in detail below) on the assertion that Toshiba and its other victims are likely to infringe at least one of the Tying Patents—including, but not limited to, the Patents-in-Suit. IV operates essentially like a protection racket, holding out a

license to the Tying Patents as a means to obtain at least some measure of reprieve from IV's unlawful hold-up campaign, and a license to the Tied Patents as the "payoff" essential to obtaining that reprieve.

4.      IV has unlawfully created monopoly power in the relevant market for a portfolio consisting of the Tying Patents. The portfolio is bespoke, consisting of patents that IV argues read on the victim's existing products, and by design includes more patents than anyone could litigate economically. These features allow IV to claim that there is no reasonable substitute for a license to that portfolio even if, as is the case, there would be economic alternatives (including litigation) to a license to individual patents, including the Patents-in-Suit. In short, IV contends that a license to IV's Tying Patent portfolio is indispensable. The fact that IV has been able consistently and profitably to charge monopoly prices—typically hundreds of millions of dollars for just a single portfolio license—demonstrates that demand-side substitutability does not limit IV's monopoly power.

5.      IV has conditioned a license to the Tying Patents on Toshiba's agreement to also take and pay for a license to the entirely irrelevant and unwanted Tied Patents. IV has not offered a license to the Tying Patent portfolio on a stand-alone basis. To make matters worse, IV deliberately obfuscates its patent holdings, making it impossible for Toshiba and other victims to determine which of the patents that IV may assert are relevant to Toshiba's and other victims' products at any time.

6.      Despite more than two years of negotiations, IV has not offered Toshiba a license to the Tying Patents at a price reflective of those patents alone. Instead, IV's demands have consistently packaged together the 3,700 Semiconductor Patents with more than 10,000 additional patents, all of which are part of larger patent-holding funds, Invention Investment

Fund I ("IIF I") and Invention Investment Fund II ("IIF II"). IV has admitted that these additional patents—the Tied Patents— do not relate to semiconductor technology. Unlike the Tying Patents, to which IV contends that Toshiba must have a license, IV does not even suggest that the Tied Patents are relevant to Toshiba's business.

7.      IV does not simply add the Tied Patents to the Tying Patents "for free." Rather, on information and belief, IV attributes a significant percentage of the payments it seeks to extract from Toshiba to the irrelevant Tied Patents.

8.      IV is thus extending its unlawful monopoly power rooted in the Tying Patent portfolio to the Tied Patents, seeking to extract supra-competitive royalties for the package license. IV's extraction of supra-competitive royalties affects a substantial amount of commerce and has raised prices to Toshiba and other putative licensees and ultimately consumers.

9.      Moreover, by forcing Toshiba and other victims to take a license to thousands of invalid Tied Patents, IV reduces the economic incentives of its coerced licensees to challenge the validity of the Tied Patents. Such reduction in the incentives to challenge invalid patents has significant anticompetitive effects in the markets for the Tied Patents and the downstream products implementing those patents. The effect of IV's conduct is directly contrary to the public policy that invalid or not-infringed patents should not repress competition.

## II.      IMPERMISSIBLE COLLECTION OF ROYALTIES FROM INVALID PATENTS

10.      IV is forcing and seeking to force Toshiba and other victims to license patent portfolios that include thousands of invalid patents, including the Patents-in-Suit.

11.      IV' strategy is based on leveraging the cumulative power of hundreds or thousands of patents of wide-ranging quality and the threat of serial litigation they produce, which creates hold-up power far in excess of the combined value of the inventive contributions of the individual patents that comprise the portfolio.  It is not engaged in bona fide patent

licensing.  Accordingly, IV is not troubled by widespread invalidity of the patents in its portfolio. IV insists that Toshiba and other victims license the portfolio without regard to the validity of the constituent patents, and in fact licenses invalid patents.

12.     IV's conduct has severe anticompetitive effects in a relevant market for a patent portfolio comprised of the Tying Patents. IV, as the sole licensor of that portfolio, which it contends is indispensable to semiconductor firms such as Toshiba, has monopoly power in the relevant portfolio market. By forcing Toshiba and other victims to accept licenses to thousands of invalid patents, IV eliminates the economic incentive of its coerced licensees to challenge the validity of those patents with anticompetitive effect and contrary to public policy.

13.     The foregoing constitutes patent misuse.

## III.     UNLAWFUL MONOPOLIZATION

14.     Toshiba hereby incorporates its Antitrust Counterclaims, set forth below, by reference in their entirety.

15.     IV has illegally monopolized the relevant market for a patent portfolio, which it asserts is indispensable for making, selling, and using flash memory, system on chip (SoC), USB host controller, and hard drive products and potential redesigned alternatives to those products ("Semiconductor Portfolio Market" or "Semiconductor Portfolio"). IV has monopolized this market by aggregating thousands of related patents to create a portfolio that IV contends Toshiba and other semiconductor firms must license to continue operating their businesses. By maintaining exclusive licensing authority over the Semiconductor Portfolio and the patents comprising it, IV creates, maintains, and exploits bottleneck access to what IV contends to be collectively unavoidable patents, for which reason no substitute exists. As the sole licensor to the Semiconductor Portfolio, IV controls 100% of the relevant Semiconductor Portfolio Market. IV's business practices and public statements leave no doubt that it considers "the portfolio"—

not the thousands of constituent patents—as the relevant product. For IV, the portfolio is greater than the sum of its parts and a different product. It is that product, "the largest portfolio of active patent assets in the world," which IV uses to inflict cost and uncertainty on operating companies to extract monopoly rents. IV has thus impermissibly broadened the scope of the Patents-in-Suit as constituent parts of the Semiconductor Portfolio by using them to obtain a market benefit beyond what inheres in each of the statutory patent rights with anticompetitive effects.

16.     IV repeatedly has demonstrated its power to raise prices for its Semiconductor Portfolio by successfully charging supra-competitive royalties without suffering loss of demand or sales toward other licensors. The nine-figure payments that IV routinely extracts from licensees do not reflect the inherent value of the patents in IV's portfolio, which a licensee would pay in a competitive market. Rather, the payments reflect hold up value in excess of the sum of the value of constituent patents, resulting from IV's deliberate hold-up strategy. IV creates otherwise-absent monopoly power by mass patent aggregation followed by serial patent assertion and threats of serial patent assertion in furtherance of the underlying anticompetitive hold-up scheme.

17.     By aggregating patents with the intent of subsequently using them as a means to impose costs through serial litigation regardless of the merits of the individual claims, IV makes it prohibitively costly for a target to invest in defending against alleged infringement of its patent portfolio. For even if the target successfully defeats IV's first wave of asserted patents, IV's strategy is to file another lawsuit, and then another.  Indeed, IV has sued Hynix Semiconductor, Canon, AT&T, Nextel, T-Mobile, U.S. Cellular, Symantec, Motorola Mobility, Leap Wireless International and Capital One two times or more. Consequently, a rational target would pay for limited patent peace, even if IV does not have a single valid and infringed patent in its portfolio.

Such payments are therefore not compensation for the inventive value of the patents. Rather, they are hold-up payments, entirely attributable to IV's patent aggregation and serial assertion strategy. Deliberately maximizing the cumulative cost of patent litigation in order to extract payments above and beyond the value of the patent in a competitive marketplace extends the patent monopoly to derive a benefit not attributable to the use of the patent's teaching and therefore constitutes misuse.

18.     IV amplified its hold up threat vis-à-vis Toshiba by threatening to sell patents from the Semiconductor Portfolio to known "aggressors" that are "eager to monetize," unless Toshiba gave in to IV's demands. IV represented to Toshiba that it would not reduce its demands for a Semiconductor Portfolio license following the patent sale to the aggressors. When Toshiba refused to give in to IV's demands, IV transferred its 5,581,498 patent to Talon Research LLC ("Talon"), another patent troll, which sued Toshiba three days later.  The purpose and effect of IV tag-teaming with Talon were to increase the hold-up threat vis-à-vis Toshiba and to extract payments from the Patents-in-Suit, which are part of the Portfolio, in excess of the value that the patent monopoly is intended to confer, thus impermissibly broadening the scope of the patent grant.

19.     IV has acted with specific intent to monopolize. It has carefully chosen, aggregated, and asserted patents alone and in collaboration with Talon specifically in order to maximize their cumulative hold-up value.

20.     IV's conduct has harmed the competitive process by forcing and seeking to force Toshiba and other semiconductor firms to pay monopoly overcharges for a Semiconductor Portfolio license, thus raising costs and reducing the incentive to innovate in the downstream product markets for flash memory, systems on chip (SoC), USB host controller,  and hard drive

technologies, as operating companies such as Toshiba foresee that if they achieve success by selling a product with enough revenue to attract IV, IV will seek to "tax" it.

21.     Moreover, IV's campaigns of serially asserting waves of weak patents to subject its victims to asymmetric litigation costs and coerce them into taking portfolio licenses at exorbitant prices forces its victims, including Toshiba, to expend significant resources in defending against IV's monopolistic course of conduct. Such payments to IV are "licenses" and "royalties" in name only.  In reality, they are simply hold-up payments, which, as alleged above, restrict output and raise prices in the downstream market for the technology-bearing products, therefore harming consumers.  Moreover, by raising the costs of companies such as Toshiba that compete with IV's investors, IV injures competition in the downstream product markets for flash memory, system on chip (SoC), USB host controller, and hard drive products.

22.     Through the strategic abuse of its Semiconductor Portfolio to extract hold-up value, IV has committed patent misuse rendering the Patents-in-Suit unenforceable for so long as the misuse continues.

### Reservation of Defenses

To the extent not already pled, TAEC reserves its right to add additional defenses pending further investigation and discovery.  TAEC also reserves its right to rely on any defenses asserted by any other party in this case.

### Demand For A Jury Trial

TAEC demands a jury trial.

### Prayer For Relief On IV's Complaint

WHEREFORE, TAEC prays for relief as follows:

A.     That the Court enter judgment in favor of TAEC and against IV on IV's claims

against TAEC for patent infringement;

B.   That TAEC is found not to infringe the '819 patent, '431 patent, '606 patent, '132 patent, '270 patent, '016 patent, '045 patent, '742 patent, '371 patent and '788 patent;

C.   That the '819 patent, '431 patent, '606 patent, '132 patent, '270 patent, '016 patent, '045 patent, '742 patent, '371 patent and '788 patent be found invalid;

D.   That the '819 patent, '431 patent, '606 patent, '132 patent, '270 patent, '016 patent, '045 patent, '742 patent, '371 patent and '788 patent be found unenforceable on account of misuse;

E.   That the Court find this case exceptional under 35 U.S.C. § 285 and order IV to pay TAEC its costs and attorneys' fees; and

F.   That the Court grant such other relief as the Court deems just and proper under the circumstances.

## COUNTERCLAIMS

## INTRODUCTION TO ANTITRUST COUNTERCLAIMS

1.   Intellectual Ventures is a patent-assertion entity ("PAE") whose business strategy is to take exclusive rights that were designed to create incentives for innovation and turn them into weapons to hold up operating companies for ransom.  Intellectual Ventures I LLC, Intellectual Ventures II LLC, Intellectual Ventures Management, LLC, Invention Investment Fund I, L.P., and Invention Investment Fund II, LLC are collectively referred to as "Intellectual Ventures."  Intellectual Ventures' hold up has nothing to do with licensing innovative technologies. Rather, Intellectual Ventures specifically targets long established and widely used technologies to maximize its threat of disruption. Now, Intellectual Ventures has targeted Toshiba by demanding hundreds of millions of dollars for the continued use of long-established

technologies, such as those relating to testing and debugging electronic systems circuits. Over the course of the past three years, Intellectual Ventures has variously demanded lump sums in the amount of hundreds of millions of dollars and claimed a percentage of Toshiba Corporation's global semiconductor memory revenues. The exact amount of Intellectual Ventures' demands keeps changing and is ultimately arbitrary, because it is not tied to any particular patent or technology, as would be the case in a bona fide licensing negotiation. Indeed, in a December 2011 meeting, Intellectual Ventures explained that, even if Toshiba had existing licenses covering 10% of Intellectual Ventures' patents, Intellectual Ventures would consider that fact irrelevant. Intellectual Ventures' demand is thus for a ransom, and Intellectual Ventures will take whatever it can get away with.

2.      Intellectual Ventures claims that it provides a valuable service to inventors and operating companies alike. "We're here to ensure a market for invention continues to thrive." In fact there is no procompetitive or efficiency justification for what, in substance, is a protection racket.

- About its patent buying process, Intellectual Ventures claims on its website: "We are very selective about the patent assets we buy." Not so. In reality, Intellectual Ventures simply seeks to aggregate cheap patents into large portfolios and exploit its resulting ability to impose litigation costs and uncertainty on its victims.

- About the quality of its patents, Intellectual Ventures claims that it selects and buys "only the highest-quality assets," But the majority of the patents Intellectual Ventures acquires have little or no intrinsic value. The patents at issue in this case are all invalid, not infringed or otherwise of such low quality that no one would rationally assert them on a stand-alone basis. Intellectual Ventures' power results

from large aggregations of low quality patents, not from licensing individually valuable technology.

- About the purpose of its patent buying program, Intellectual Ventures claims on its website: "[W]e provide capital to inventors and give their ideas a better chance of getting into the marketplace." In reality, Intellectual Ventures does not care about inventors or the dissemination of new ideas. To the contrary, Intellectual Ventures is looking specifically for cheap patents with vague claims to maximize the hold-up value, as demonstrated by the patents at issue in this case.

- Publicly, Intellectual Ventures claims that its package licenses are valuable products sold in response to market demand: "[I]n-depth knowledge of our assets allows us to package them into products and solutions that can best serve the market." In reality, Intellectual Ventures threatens those who refuse to give in to its demands with strategic divestiture of patents from its portfolio to known "aggressors" that are "eager to monetize." When Toshiba balked at Intellectual Ventures' demands, Intellectual Ventures made good on its threat. Intellectual Ventures transferred a patent to an aggressor aptly named Talon Research, LLC ("Talon") and Talon sued Toshiba three days later to demonstrate that Intellectual Ventures means business. Despite all public protestations to the contrary, Intellectual Ventures is in the protection money business, not the patent licensing business.

3.      By aggregating 3,700+ patents into a Semiconductor Portfolio with the specific purpose of extracting hold-up payments from Toshiba and other semiconductor firms, Intellectual Ventures has run afoul of Section 2 of the Sherman Act. Intellectual Ventures has

illegally monopolized a market for licenses to a patent portfolio that Intellectual Ventures claims is essential for making, selling, and using flash memory, system on chip (SoC), USB host controller, and hard drive products and potential redesigned alternatives to those products. Intellectual Ventures has monopoly power rooted in hold-up and strategic aggregation of more patents than anyone could litigate economically, all of which Intellectual Ventures claims leaves its victims with no alternative to licensing Intellectual Ventures' portfolio.  Intellectual Ventures has not acquired and maintained its monopoly by "superior product, business acumen, or historic accident," but by strategically exploiting the lock-in effects of its Semiconductor Portfolio on downstream semiconductor firms for the purpose of extracting hold-up payments.

4.      In addition to violating Section 2 of the Sherman Act, Intellectual Ventures' conduct violates Section 7 of the Clayton Act, because its acquisition of thousands of patent assets for the specific purpose of creating monopoly power in the market for Intellectual Ventures' Semiconductor Portfolio in order to hold up semiconductor firms "may . . . substantially . . . lessen competition, or . . . tend[s] to create a monopoly." 15 U.S.C. § 18.

5.      Finally, Intellectual Ventures has conspired with Talon to restrain trade and engage in patent hold-up in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, to magnify the threat that Intellectual Ventures had created against Toshiba and other semiconductor firms, Intellectual Ventures conspired with Talon to obtain patents that Intellectual Ventures carved off from its portfolio and to assert them against Intellectual Ventures' targets.

## JURISDICTION AND VENUE

6.      Toshiba brings these counterclaims pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, based on Intellectual Ventures' violation of Sections 1 and 2 of the

Sherman Act, and Section 7 of the Clayton Act, 15 U.S.C. §§ 2 & 18. Toshiba files these counterclaims to prevent and restrain Intellectual Ventures' anticompetitive conduct and other violations of the law, and to recover damages, the costs of this suit, and reasonable attorneys' fees.

7.      This Court has jurisdiction over the federal counterclaims alleged under 28 U.S.C. §§ 1331, 1332, and 1337(a).

8.      Intellectual Ventures has submitted to the personal jurisdiction of this Court by, without limitation, bringing the present action alleging infringement of the Patents-in-Suit.

9.      Personal jurisdiction may also be asserted against all of the Intellectual Ventures entities in this District based on their agency relationships. Intellectual Ventures I LLC acts solely as the agent of Invention Investment Fund I, L.P. All of Intellectual Ventures I LLC's actions may be imputed to Invention Investment Fund I, L.P. Similarly, Intellectual Ventures II LLC acts solely as the agent of Invention Investment Fund II, LLC. All of Intellectual Ventures II LLC's actions may be imputed to Intellectual Investment Fund II, LLC.

10.     In commencing this action, Intellectual Ventures I LLC and Intellectual Ventures II LLC acted, as always, as mere vessels for Intellectual Ventures Management, LLC, Invention Investment Fund I, L.P., and Invention Investment Fund II, LLC. On information and belief, Intellectual Ventures I LLC, Intellectual Ventures II LLC, Intellectual Ventures Management, LLC, Invention Investment Fund I, L.P., and Invention Investment Fund II, LLC are alter egos of one another.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because, during the relevant period, Intellectual Ventures filed its patent-infringement claims against Toshiba in this district, Intellectual Ventures resided, transacted business, was found, or had

agents in this district, and/or because a substantial portion of the affected interstate trade and commerce described herein has been carried out in this district.

## THE PARTIES

12.     Toshiba America Electronic Components is a California corporation with a principal place of business at 9740 Irvine Boulevard, Irvine, California 92612

13.     Intellectual Ventures Management, LLC is a limited-liability company incorporated in the state of Washington with its principal place of business at 3150 139th Ave SE, Building 4, Bellevue, WA 98005.

14.     Invention Investment Fund I, L.P. ("IIF 1") is a Delaware limited partnership with its principal place of business in Bellevue, Washington.

15.     Invention Investment Fund II, LLC ("IIF 2") is a Delaware limited liability company with its principal place of business in Bellevue, Washington.

16.     Intellectual Ventures I LLC is a limited-liability company incorporated in Delaware with its principal place of business at 3150 139th Ave SE Building 4, Bellevue, WA 98005.

17.     Intellectual Ventures II LLC is a limited-liability company incorporated in Delaware with its principal place of business at 3150 139th Ave SE Building 4, Bellevue, WA 98005.

## FACTS SUPPORTING TOSHIBA'S ANTITRUST COUNTERCLAIMS

### A.     Intellectual Ventures' Scheme To Attack The Semiconductor Industry

18.     Intellectual Ventures analyzed the semiconductor industry, identified common and long-used technologies that underlie the daily operations of flash-memory, SoC, USB host controller, and hard-drive makers and, using shell companies, secretly amassed a large patent portfolio that enables Intellectual Ventures to credibly threaten waves of lawsuits against

semiconductor firms that refuse to pay its demands. Intellectual Ventures claims that its Semiconductor Portfolio provides it with such an ability to impose costs and uncertainty on its targets that Toshiba and other semiconductor firms cannot avoid taking a license to Intellectual Ventures' Semiconductor Portfolio, no matter from which other patentees those firms purchase licenses and no matter how those firms carry out their businesses.

19.      Intellectual Ventures identified the semiconductor industry as a target-rich environment. Semiconductor manufacturers rely on multi-step processes to manufacture complex products often comprised of hundreds of components. Both processes and components can be subject to vague and ill-defined patent claims, which generally render the patents invalid or— upon closer analysis of the actual processes and products—not infringed. But since Intellectual Ventures does not care about the actual strength of a patent but only about its potential for disruption once aggregated with similar patents, the semiconductor space with its large number of successful companies all committed to and locked into using certain basic technologies was highly attractive.

20.      After selecting flash-memory, SoC, USB host controller, and hard-drive manufacturers as targets, Intellectual Ventures engaged in a patent acquisition campaign, the goal of which was to amass a semiconductor patent portfolio large enough to credibly threaten waves of litigation and cast uncertainty over Toshiba's and other targets' business operations. Ultimately, Intellectual Ventures succeeded in amassing more than 3,700 flash-memory, SoC, USB host controller, and hard-drive patents, many if not all of which are invalid, not infringed, or both.

21.      Intellectual Ventures thus acquired the ability to threaten Toshiba and other semiconductor firms with the prospect of many years of litigation and uncertainty. Intellectual

Ventures had that power even if not a single patent in its Semiconductor portfolio were valid or infringed, because every lawsuit—irrespective of its merits—would impose significant cash and non-cash opportunity costs on its targets, in addition to uncertainty. The power that Intellectual Ventures obtained in that fashion is "hold up" power, that is, the ability to threaten the loss of irreversibly committed investments such as plants, inventory, and parts already sold to original equipment manufacturers. The hold-up value of Intellectual Ventures' portfolio—Intellectual Ventures' ability to cast a shadow of uncertainty over Toshiba's semiconductor business—far exceeds the sum of the value of the inventive contributions of the patents that make up the portfolio. Such power in excess of the value of the inventive contribution of the constituent patents is unlawfully obtained monopoly power, not the lawful "power to exclude" that is inherent in the patent grant.

22.     Intellectual Ventures' targeted acquisition strategy allowed Intellectual Ventures to claim that Toshiba and other semiconductor firms could not escape Intellectual Ventures' infringement claims, regardless of whether those targets obtained alternative licenses or redesigned their products. The goal, which Intellectual Ventures achieved, was to build a portfolio that gave it hold-up power over Toshiba and other semiconductor firms.

23.     To place its victims at further disadvantage, Intellectual Ventures' typical strategy – which it employed against Toshiba and other semiconductor firms – is to refuse to disclose its full patent holdings. Even today, Intellectual Ventures does not reveal its full collection of patents, or disclose the specific contents of its Semiconductor Portfolio.

24.     After Intellectual Ventures had successfully assembled its Semiconductor Portfolio, it was ready to pounce.

B.     **Intellectual Ventures' Assault On Toshiba**

1.     *Intellectual Ventures seeks to hold up Toshiba to the tune of hundreds of millions of dollars*

25.     Intellectual Ventures approached and first met with Toshiba Corporation to discuss a possible license on January 28, 2010. Over the following months, Intellectual Ventures explained that it had created a vast, custom-built portfolio to cover Toshiba's existing product lines and potential technological redesign alternatives. It claimed to have amassed more than 3,700 patents reading on all aspects of Toshiba's business, including circuits, methods, design, testing, packaging, and manufacturing. Intellectual Ventures represented that it had populated its Semiconductor Portfolio with more than 450 SoC-specific and 250 memory-specific assets, and that its digital-imaging portfolio had more than 2,000 assets. Intellectual Ventures insisted that Toshiba had no way to redesign its products to avoid Intellectual Ventures' custom-built and growing portfolio.

26.     Intellectual Ventures' shakedown of Toshiba was methodical and designed to maximize the hold-up value of Intellectual Ventures' portfolio. Intellectual Ventures disclosed a small number of its semiconductor-related patents in four separate waves. It made clear that Toshiba had nowhere to go because no one else could offer Toshiba a clearing position over Intellectual Ventures' portfolio. Intellectual Ventures further claimed that its portfolio was so large that Toshiba could not escape its reach by redesigning its products. The message was clear: No matter how many patents Toshiba would seek to invalidate, Intellectual Ventures had thousands more stashed away in its vast network of shell companies.

27.     From late 2011 to date, Intellectual Ventures has demanded that Toshiba pay hundreds of millions for a license to the Semiconductor Portfolio. Intellectual Ventures' demands are vastly in excess of the combined value of the inventive contributions of the patents

that make up the portfolio. On information and belief, Intellectual Ventures' demands are also vastly in excess of what it paid for the constituent patents in a competitive market. Intellectual Ventures' demands reflect what it thinks Toshiba is willing to pay for protection from Intellectual Ventures' Semiconductor Portfolio litigation threat, rather than a genuine royalty based on the value, if any, of the patented technologies.

28.     From Toshiba's perspective, Intellectual Ventures' demands for a portfolio license were excessive and Intellectual Ventures' infringement claims with respect to individual patents, including the Patents-in-Suit, were meritless.

      2.     ***Intellectual Ventures Conspires with Other Patent Assertion Entities against Toshiba***

29.     Intellectual Ventures further amplified the hold-up power of its Semiconductor Portfolio through a threat-creation mechanism known euphemistically as the "Alternative Commercialization Efforts," or "ACE," program. This program exposes "unwilling licensees" to patent assertions by numerous entities, thus amplifying the impact of Intellectual Ventures' portfolio by creating a royalty-stacking threat that did not exist before. Intellectual Ventures told Toshiba that, "[i]n the near future, SoC, memory and digital imaging patents in Intellectual Ventures' portfolio will be eligible for divestiture through ACE." Intellectual Ventures would divest those patents to "aggressors" that "are eager to monetize." Following the divestiture, the "aggressors" would then, along with Intellectual Ventures, seek even greater hold-up payments from Toshiba.

30.     Intellectual Ventures can subdivide its portfolio without compromising its ability to hold up Toshiba, because it uses the ACE program when it "has sufficient coverage in a market segment," that is, enough related patents to share its portfolio with other patent assertion entities to orchestrate a coordinated attack. Intellectual Ventures explained that the clock was

ticking and that "the window will close for Toshiba to receive preferred price, terms and service."

31.     The point of ACE is to turn up the heat on targets that refuse to give in. ACE allows Intellectual Ventures to threaten coordinated attacks by multiple parties, fueled by the same portfolio. Intellectual Ventures put Toshiba on notice that, after bringing in third party aggressors, Intellectual Ventures' own demands vis-à-vis Toshiba would *not* be reduced, even though a license to Intellectual Ventures' portfolio could no longer ensure patent peace with respect to the patents that had been spun off for purposes of the joint attack. Intellectual Ventures leveled the ACE threat solely to force Toshiba to accept Intellectual Ventures' demands.

32.     On September 6, 2011, Intellectual Ventures gave Toshiba an ultimatum: pay now or face the consequences. Twenty days later, Intellectual Ventures transferred its 5,581,498 patent—a 17-year old patent—to Talon Research, LLC, a patent-assertion entity and one of the ACE program aggressors. Three days after that, Talon sued Toshiba America Electronic Components, Inc. for infringement of the Intellectual Ventures patent.

### 3.     *Intellectual Ventures Files a Sham Lawsuit, with the Threat of Many More to Follow*

33.     Recognizing that Toshiba would not easily succumb to its anticompetitive patent aggregation and hold-up strategy, Intellectual Ventures sought to impose further injury on Toshiba through litigation.[1] On March 13, 2013, Intellectual Ventures filed a patent-infringement

---

[1]     While Toshiba refused to pay protection money, Intellectual Ventures' hold up of other Flash memory makers and of other manufacturers in the semiconductor-technology space produced more immediate results. Intellectual Ventures publicly announced licensing agreements with SAP AG on January 6, 2011; RIM (now BlackBerry) on March 30, 2011; Micron Technology, Inc. on May 31, 2011; Wistron Corporation on September 21, 2011; Pantech Co. Ltd. on October 12, 2011; Nanya Technology Corp. on November 30, 2011; Cavium, Inc. on July 18, 2012; SK Hynix, Inc. and Elpida Memory, Inc. on September 24, 2012; Microsemi on January 21, 2013; Lattice Semiconductor on March 6, 2013; ASI Semiconductor, Inc. on September 23, 2013; and Seiko Epson Corp. on January 8, 2014, among others.

lawsuit against Toshiba in the United States District Court for the District of Delaware, asserting 10 patents, which Intellectual Ventures claims cover "all Toshiba NAND flash memory products," "all Toshiba USB 2.0 and 3.0 host controller products," "Toshiba's microcontroller products such as Toshiba's ARM-based controllers with Embedded Trace Marocell," and "Toshiba's hard drive products." Intellectual Ventures brought this action not in pursuit of a good-faith determination of its legal rights to the 10 patents at issue, but as a means to impose costs and uncertainty on Toshiba, in furtherance of Intellectual Ventures' anticompetitive hold-up scheme.

34.     Intellectual Ventures sought treble damages for willful infringement against Toshiba—despite lacking any basis for seeking such relief. The Court properly dismissed Intellectual Ventures' willful-infringement claims on September 3, 2014, noting that IV's allegations were insufficient and further observing that "notice of the infringement risk via the letter written only one day before the complaint was filed does not constitute a showing of objective recklessness on the part of Toshiba."

<u>**COUNTERCLAIM COUNT I**</u>
**(Monopolization in Violation of Section 2 of the Sherman Act)**

35.     Toshiba repeats and re-alleges the allegations of the preceding Paragraphs of these Counterclaims as if fully set forth herein.

**A.      The Relevant Market Is The Licensing Market For The Patents In Intellectual Ventures' Semiconductor Portfolio**

36.     Intellectual Ventures has violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the market for licenses to its Semiconductor Portfolio, which Intellectual Ventures claims is comprised of 3,700+ patents that read on flash-memory, SoC, USB host controller, and hard-drive technology.

37.     Intellectual Ventures' Semiconductor Portfolio in the United States constitutes a relevant market for the reasons stated earlier. Semiconductor firms such as Toshiba, Intellectual Ventures claims, have no choice but to take a license to Intellectual Ventures' portfolio in order to continue selling their current semiconductor products or redesigned alternative products.

**B.      Intellectual Ventures Possesses Monopoly Power In The Relevant Market**

38.     Intellectual Ventures demands that Toshiba license its Semiconductor Portfolio or face the cost and uncertainty of waves of baseless litigation based on tranches of patents from the Semiconductor Portfolio. Intellectual Ventures' Semiconductor Portfolio does not contain valuable patents that would enable Toshiba to innovate, introduce new products, lower costs, or enhance the value of existing products. Instead, Intellectual Ventures' Semiconductor Portfolio is an artificial roadblock, designed to enable it to impose cost and uncertainty on its targets. Intellectual Ventures has the power to control price for licenses to its Semiconductor Portfolio, as evidenced by both its demands for in excess of reasonable royalties for the constituent patents and acquisition costs in competitive markets.

39.     Both direct and indirect evidence demonstrate Intellectual Ventures' monopoly power.

40.     There is ample direct evidence of Intellectual Ventures' monopoly power. Intellectual Ventures admits to having secured more than $3 billion in total licensing revenue to date, even though its monetization program is only in its incipiency. That amount, which is sure to grow far larger, eclipses the competitive prices that Intellectual Ventures paid for its patents. Intellectual Ventures admits to having paid at most one-sixth of what it has subsequently earned in licensing patents and patent applications.  Illustratively, in suing Symantec and Trend Micro for infringement of a patent claiming malicious-software-detention technology, Intellectual

Ventures argued that those two firms should pay some $310 million for a license. Intellectual Ventures had bought that patent as part of a portfolio for $750,000.

41.     The amounts that Intellectual Ventures has sought from Toshiba show that Intellectual Ventures has monopoly power over the market for licenses to its Semiconductor Portfolio. In a competitive market in which Intellectual Ventures' patents were disaggregated, obtaining 5-year licenses to the patents in Intellectual Ventures' IIF 1 and IIF 2 would cost far less than the hundreds of millions of dollars that Intellectual Ventures has demanded of Toshiba. Indeed, upon information and belief, Intellectual Ventures purchased the patents in its semiconductor-technology portfolio at a fraction of what it has charged Toshiba because those patents were then available at competitive prices.

42.     In addition to the direct evidence, there is indirect evidence of monopoly power. Intellectual Ventures has a 100 percent share of the relevant market because it alone sells a license to the Semiconductor Portfolio, which Intellectual Ventures claims to be indispensable for Toshiba and anyone manufacturing semiconductor products. By controlling 100 percent of the market, and due to the absence of any supply- or demand-side constraints on its power over price, Intellectual Ventures has monopoly power.

43.     Supply-side responses, like entry, do not constrain Intellectual Ventures' monopoly power in the relevant market, because Intellectual Ventures ensures that its patent sources (i.e., the assignors) do not retain independent rights to license their patents.

C.      **Intellectual Ventures Willfully Acquired and Maintains Its Monopoly Power**

44.     As alleged below, Intellectual Ventures' power to control price results from anticompetitive conduct, not simply from patent ownership. In aggregating and obfuscating its claimed 3,700+ semiconductor patents, Intellectual Ventures secured monopoly power that far exceeds the summed value of those patents when disaggregated. That acquisition and

maintenance of monopoly power is illegal because Intellectual Ventures acquired and is maintaining it willfully, rather than by means of superior product, business acumen, or historic accident.

45.     Intellectual Ventures does not offer a superior product but merely protection from a fabricated threat. If Intellectual Ventures' portfolio license were a valuable—let alone superior—product, then there would be demand for it. But there are no willing customers for Intellectual Ventures' portfolio license because Intellectual Ventures offers nothing of technological value.

46.     Nor does Intellectual Ventures' monopoly power result from business acumen. Rather, it flows from threats and intimidation, which are the very opposite of business acumen.

47.     Lastly, Intellectual Ventures' monopoly power is not the result of historic accident. Intellectual Ventures custom-built its Semiconductor Portfolio to hold up operating companies. Intellectual Ventures' monopoly power is the result of careful planning and execution of an unlawful scheme.

48.     As explained below, Intellectual Ventures has harmed the competitive process in at least three ways. First, it has amassed patents that Intellectual Ventures alleges read on existing flash-memory, SoC, USB host controller, and hard-drive products, regardless of how they are designed. Second, Intellectual Ventures has foreclosed direct licensing between manufacturers and the former patent owners or licensors from which Intellectual Ventures obtained its patents. Those former owners of semiconductor patents competed with one another for licensing opportunities. Intellectual Ventures has eliminated that competition entirely with respect to the 3,700+ patents in its Semiconductor Portfolio, creating a technology bottleneck over which it has exclusive licensing authority. Third, Intellectual Ventures excludes competition

through obfuscation and concealment. Specifically, Intellectual Ventures hid its patent acquisitions through a network of some 2,000 shell companies and, to this day, refuses to disclose the full contents of its portfolios.

49.     Through this overall scheme, Intellectual Ventures has eliminated choice in the relevant market and manufactured a hold-up threat against flash-memory, SoC, USB host controller, and hard-drive manufacturers.

> **a.     Rather than Identify Promising New Technologies, Intellectual Ventures Acquires Patents to Attack Existing Products**

50.     In building a semiconductor portfolio to attack products that companies independently invented, Intellectual Ventures turns the patent regime on its head. Congress developed the patent system to incentivize innovation. U.S. CONST. Art. 1, § 8, cl. 8. The Supreme Court recently observed that "'the public interest in granting patent monopolies' exists only to the extent that 'the public is given a novel and useful invention' in 'consideration for its grant.'" *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2232 (2013) (quoting *United States v. Singer Mfg. Co.*, 374 U.S. 174, 199 (1963)). By protecting technological innovations, patent grants enable innovators to commercialize their inventions, either by making and selling the products that embody the invention or licensing others to do so. *Bona fide* inventors and research-and-development companies thus create and patent new ideas that have value when used in products, a process that typically enhances output and benefits consumers. In this normal from-patent-to-product dynamic, a patent's inventive contribution relative to existing technological alternatives determines its value. That is, a potential licensee will evaluate a patent license by asking what it gets by adopting the invention (e.g., better performance, lower costs) and how that compares to its non-infringing alternatives (e.g., workarounds, "doing without"). This is known as *ex ante*

licensing, in that market forces determine the value of the patented invention *before* firms have commenced using the invention.

51.     Intellectual Ventures' anticompetitive strategy escapes the market mechanisms that govern *ex ante* licensing. Intellectual Ventures reverses the normal from-patent-to-product process by using the designs of existing products as targets for custom-built patent portfolios and turns it into a product-to-patent process. By starting from widely adopted and existing technology, this process is not designed to produce an innovation, but only to encumber and tax existing technology. Realizing that companies like Toshiba have substantial sunk investments in their existing product designs, Intellectual Ventures works backwards from those designs to identify unenforced and individually weak patents that it may later claim, baselessly, to be blocking patents, which it acquires and aggregates into large portfolios. Intellectual Ventures developed this from-product-to-patent approach to build a portfolio that it claims Toshiba and other semiconductor firms cannot avoid infringing and to create *ex post* hold-up power. Thus, due to Intellectual Ventures' strategic patent aggregation, it is not the individual patents' inventive contributions, validity, or scope, but the cost to the firm of defending itself against the strategic assertion of Intellectual Ventures' Semiconductor Portfolio, and the inherent risk that entails, that determines the value of the portfolio.

### b.     Intellectual Ventures' Targeted Patent Aggregation Is Anticompetitive

52.     By combining many invalid and not-infringed semiconductor patents into a portfolio, Intellectual Ventures creates monopoly power that would not otherwise exist. In other words, Intellectual Ventures does not simply transfer a fixed amount of market power from the assignors to itself. The hold-up power of Intellectual Ventures' Semiconductor Portfolio is far greater than the sum of its parts.

53.     Beyond fueling the ability to pursue repeated infringement lawsuits, Intellectual Ventures' targeted patent aggregation greatly increases the threat that manufacturers may suffer an adverse jury verdict and the pressures that would follow, even if that verdict is later reversed. Intellectual Ventures is exploiting a mathematical function concerning the cumulative risk from individually low probability events. For purposes of illustration, consider a portfolio of 50 invalid and non-infringed patents and an error rate for the judicial process of just 1%. Mathematically, the chance of obtaining an infringement verdict for the portfolio *of invalid and non-infringed patents* is 40%. If the portfolio contains 200 invalid and non-infringed patents, the probability of one infringement verdict exceeds 85%. If the portfolio contains 3,700 patents, the probability is close to 100%. The large size of Intellectual Ventures' targeted portfolios means that it is prohibitively expensive and risky for potential targets to show that they are *not* infringing any patent in a given portfolio, particularly as Intellectual Ventures conceals the extent of its portfolios. In addition, the cost of litigating even 50 patent claims would be enormous. According to the American Intellectual Property Law Association, the cost of an average patent lawsuit, where $1 million to $25 million is at risk, is $1.6 million through the end of discovery and $2.8 million through final disposition. Serial litigation is proportionately more expensive. As discussed below, Intellectual Ventures' own costs of litigation are far lower.  Targeted aggregation and serial assertion thus transform patents that are invalid, not infringed, and individually weak into portfolios capable of holding-up entire industries.

54.     Intellectual Ventures ensures that no direct-licensing opportunities exist as a means to bypass its bottleneck licensing monopoly. It accomplishes this anticompetitive goal by acquiring full ownership of patents from—rather than obtaining licensing authority on behalf of—the patentees from which Intellectual Ventures obtained its patents. Intellectual Ventures

does not serve an efficient function in allowing prospective licensees to save on the transaction costs of negotiating licenses from the many semiconductor-related patent owners who compete for licensing opportunities. It is not a clearing house akin to ASCAP or BMI, whose function is to resolve otherwise difficult IP "clearance" issues. To the contrary, Intellectual Ventures creates clearance problems that would not otherwise exist, resolving them solely for its own benefit. Full ownership of all rights to their patents permits this as it transfers the power to exclude—not merely a power to license—to Intellectual Ventures, while also ensuring that prospective licensees like Toshiba cannot negotiate direct licenses with the underlying patentees.

55.    Intellectual Ventures' monopoly power harms competition and reduces innovation and consumer welfare. Intellectual Ventures' Semiconductor Portfolio consists of patents that are invalid, not infringed, and individually weak, such that they had never before been asserted against Toshiba, and would never have been asserted if Intellectual Ventures had not acquired them in bulk for the purpose of hold up at the portfolio level. Where an issued patent has not been enforced because it is likely invalid or not infringed, competition unfolds undisturbed. This state in which many patents are not enforced because they are likely invalid or not actually infringed is a competitive market outcome that benefits producers and consumers alike. That is why there is a strong "patent-related policy of eliminating unwarranted patent grants so the public will not 'continually be required to pay tribute to would-be monopolists without need or justification." *Actavis*, 133 S. Ct. at 2233 (quoting *Lear, Inc. v. Adkins*, 395 U.S. 653, 670 (1969)). There is, in economic terms, a "public good" in the ability of operating companies to innovate and commercialize products free of claims by owners of likely invalid or not-infringed patents. Intellectual Ventures, however, attempts to turn this "public good" into its own profit by combining likely invalid, not infringed, and previously unenforced patents into a large portfolio,

creating hold-up power far in excess of the combined value of the inventive contributions of the individual constituent patents.

56.     Moreover, since Intellectual Ventures avoids any meaningful productive commercial operations of its own, Intellectual Ventures escapes the normal market discipline that operating companies face in considering whether they should assert their patents. In industries with multiple innovators, each with its own patent portfolio, the threat of patent abuse is limited as efforts to exclude a rival by enforcing patents commonly subject the aggressor to patent counterclaims. Given its lack of products, Intellectual Ventures faces no such threat because, no matter how extensive and abusive its patent litigation campaign becomes, Intellectual Ventures is never subject to any patent-infringement counterclaim.

**c.      Intellectual Ventures Enhances its Monopoly Power by Concealing its Patent Acquisitions and Assets**

57.     Intellectual Ventures amplifies its hold-up threat by concealing and obfuscating its patent holdings through an extensive network of shell companies and by refusing to disclose the full contents of its Semiconductor Portfolio.

58.     Intellectual Ventures' obfuscation serves three anticompetitive goals. First, it prevents targets like Toshiba from reliably assessing Intellectual Ventures' claims that a portfolio license is necessary. Second, it complicates work-around strategies. Third, it helps Intellectual Ventures to bolster its patents against any threat of invalidation.

59.     Intellectual Ventures thus prevents its victims from evaluating the truth of Intellectual Ventures' assertions about its portfolios or charting a course around Intellectual Ventures' alleged patent positions.

          **d.**      **Intellectual Ventures Relies on the Threat of Repeated Sham Lawsuits to Extract Monopoly Rents**

60.    Should a victim of this campaign refuse to pay protection money in the form of a license, Intellectual Ventures resorts to litigation as a means to impose cost and uncertainty on its victims.

61.    Intellectual Ventures does not expect to win any one patent-infringement claim, given the poor quality of its patents. But that does not matter to Intellectual Ventures. Its strategy is to subject its targets, including Toshiba, to the millions of dollars it costs to defend each such action by asserting patent claims seriatim from its portfolio, and to the inherent risk that, eventually and despite the odds, Intellectual Ventures can obtain, even temporarily, a jury verdict that results in negative publicity or other heightened pressure on the victim. In that way, Intellectual Ventures does not use the legal process to resolve the allegations in its complaints, which only involve a small slice of the asserted portfolio. Rather, Intellectual Ventures uses the legal process itself as a weapon by filing a series of lawsuits, without regard for their individual merit, for the purpose of coercing Toshiba and other victims to pay hundreds of millions for a license to thousands of patents not at issue in any lawsuit.

62.    Intellectual Ventures ensures that its targets understand that the only escape from Intellectual Ventures' infringement claims is to buy a portfolio license, because no matter how many lawsuits its targets may win, Intellectual Ventures will continue suing and subjecting them to asymmetric discovery costs. This strategy works across industries. For instance, Capital One, one of Intellectual Ventures' targets in the banking industry, successfully defended against Intellectual Ventures' patent infringement case in the Eastern District of Virginia. Immediately afterward, Intellectual Ventures announced that "our patent portfolio is deep and we have another action pending against Capital One in Maryland." Intellectual Ventures uses its

          

lawsuits—and press releases like the one quoted above—to signal to its targets that it will not go away, even after repeated losses. Intellectual Ventures signals that its incentives to litigate differ from those of normal patent holders. Because Intellectual Ventures does not seek to vindicate any particular patent rights, it cannot be deterred from bringing additional lawsuits by resolving legal disputes about patent validity and infringement in court. Intellectual Ventures signals that because it is willing to keep litigating regardless of merit and success, the only way for a target to buy peace is to give in to Intellectual Ventures' demands. Intellectual Ventures' strategy of litigating regardless of merit is irrational as to each individual lawsuit, but is rational in pursuit of Intellectual Ventures' overall anticompetitive hold-up strategy. Intellectual Ventures understands that since it only cares about the hold-up value of its portfolio and not about the success of any individual litigation, it is rational for most of Intellectual Ventures' targets to pay demands in excess of the inherent value of Intellectual Ventures' patents, even if Intellectual Ventures' claims against them are without merit.

63.     Intellectual Ventures uses lawsuits as devices to signal its willingness to impose costs on its victims regardless of the underlying merits. In that manner, Intellectual Ventures has sued Hynix Semiconductor, Canon, AT&T, Nextel, T-Mobile, U.S. Cellular, Symantec, Motorola Mobility, Leap Wireless International and Capital One two times or more. Between May 14, 2013 and June 20, 2014 Intellectual Ventures filed at least 33 patent suits. With this pattern of mass-scale use of the litigation process as a cost-generating device, Intellectual Ventures credibly threatens to punish its targets. Intellectual Ventures' strategy works, as evidenced by the hold-up payments it has been able to extract. Intellectual Ventures has reportedly obtained $350 million from Verizon, $200-400 million from Cisco Systems, and $120 million from Intuit.

64.     As indicated above, Intellectual Ventures imposes disproportionate litigation costs on defendants. Intellectual Ventures typically takes the position that it has very little discoverable information in its possession, given that it is not the inventor of the patents-in-suit and does not commercialize anything. And it fights vigorously any discovery into Intellectual Ventures' internal correspondence, its relationship with investors, its patent portfolio generally, and its business strategies. This trait of patent assertion entities is well known. In addition, on information and belief, Intellectual Ventures benefits from economies of scale from its mass litigation strategy, as it can simply re-use discovery productions or responses across its cases and negotiate more favorable fee arrangements with its attorneys.  As a result, the discovery burdens that constitute the largest proportion of costs in patent litigation fall disproportionately on Intellectual Ventures' victims.

**D.     Intellectual Ventures Has Caused Toshiba to Suffer Antitrust Injury**

65.     Intellectual Ventures' conduct has harmed Toshiba in its business and property by imposing costs on Toshiba, by increasing the price of flash-memory, SoC, USB host controller, and hard-drive technology and by creating a monopoly in the form of Intellectual Ventures' Semiconductor Portfolio. As a result, Toshiba must either give in to Intellectual Ventures' hold-up demands, exit the semiconductor industry altogether, or pay millions of dollars to defeat each wave of Intellectual Ventures' sham patent litigation. The fact that Toshiba currently operates in the shadow of Intellectual Ventures' licensing monopoly over its portfolio is also a present injury. For example, Toshiba must now make investment decisions cognizant of the possibility that payments to Intellectual Ventures will deplete its cash resources. Intellectual Ventures has made threats and demands to Toshiba, seeking payments in excess of the inherent value of Intellectual Ventures' patents.

66.     Toshiba's injury is the kind of injury that the antitrust laws are intended to prevent. Intellectual Ventures' monopoly power would not exist but for Intellectual Ventures' unlawful asset acquisitions and attendant anticompetitive conduct, which make it impossible for Toshiba to avoid Intellectual Ventures' infringement claims without buying a license at a monopoly price. Intellectual Ventures' monetary demands, which exceed the inherent value of its patents, reflect that power. As a downstream licensee of patent inputs, Toshiba suffers harm from Intellectual Ventures' upstream, monopoly licensing overcharges.

67.     Intellectual Ventures' secret patent aggregation, and refusal to disclose the full extent of its patent holdings, make it difficult for prospective licensees to know whether they can avoid Intellectual Ventures' baseless infringement claims by using alternative technologies. Intellectual Ventures thus threatens infringement claims no matter what its targets do, which threat allows Intellectual Ventures to command monopoly prices over invalid and non-infringed patents. By aggregating a critical mass of related technologies while obscuring the true scope of its holdings, Intellectual Ventures has harmed Toshiba as a buyer of such technologies.

68.     Intellectual Ventures' conduct causes an antitrust injury and does not merely transfer the same amount of market power between firms. Strategic *ex post* aggregation and hold-up increase market power and thus cause higher prices to consumers, disrupt markets for innovation, and generally lower incentives to innovate. Potential operating companies or innovators foresee that, if they achieve success by selling a product with enough revenue to attract Intellectual Ventures, Intellectual Ventures will "tax it" using the methods described above. Foreseeing this low return caused by the Intellectual Ventures business model discourages innovators from undertaking new product innovation.

### E.     Intellectual Ventures' Conduct Has No Procompetitive Justification

69.     As described above, Intellectual Ventures pursues its targeted *ex post* patent aggregation strategy solely to create patent hold-up. Intellectual Ventures' conduct produces no *ex ante* licensing efficiencies or innovation or output gains. The only meaningful effects of Intellectual Ventures' conduct are to create otherwise-absent monopoly power, generate supra-competitive profits, suppress innovation, harm dynamic and allocative efficiency, and cause significant deadweight loss to society.

70.     Section 4 of the Clayton Act, 15 U.S.C. § 15, entitles Toshiba to treble the amount of its actual damages attributable to Intellectual Ventures' unlawful monopolization in an amount to be determined at trial, plus the cost of suit, including reasonable attorneys' fees.

71.     Section 16 of the Clayton Act, 15 U.S.C. § 26, entitles Toshiba to an injunction preventing and restraining Intellectual Ventures' conduct in violation of Section 2 of the Sherman Act, and to an award of the cost of suit, including reasonable attorneys' fees.

### COUNTERCLAIM COUNT II
**(Attempted Monopolization in Violation of Section 2 of the Sherman Act)**

72.     Toshiba repeats and re-alleges the allegations of the preceding Paragraphs of these Counterclaims as if fully set forth herein.

73.     Intellectual Ventures has engaged in the anticompetitive and exclusionary practices previously alleged with the specific purpose and intent of obtaining monopoly power in the market for licenses to its Semiconductor Portfolio, which Intellectual Ventures claims is comprised of 3,700+ patents that read on flash-memory, SoC, USB host controller, and hard-drive technology.

74.     Intellectual Ventures has either already acquired or presents a dangerous probability of achieving monopoly power in this relevant market.

75.     Intellectual Ventures has thereby attempted to monopolize this relevant market, in violation of Section 2 of the Sherman Act.

76.     As a direct result of Intellectual Ventures' attempted monopolization, Toshiba has been injured in its business and property, as previously alleged. Toshiba's injuries directly result from Intellectual Ventures' unlawful conduct and are injuries of the type the antitrust laws were intended to prevent and which flow from what makes Intellectual Ventures' conduct unlawful.

77.     Section 4 of the Clayton Act, 15 U.S.C. § 15, entitles Toshiba to treble the amount of its actual damages attributable to Intellectual Ventures' unlawful attempted monopolization in an amount to be determined at trial, plus the cost of suit, including reasonable attorneys' fees.

78.     Section 16 of the Clayton Act, 15 U.S.C. § 26, entitles Toshiba to an injunction preventing and restraining Intellectual Ventures' conduct in violation of Section 2 of the Sherman Act, and to an award of the cost of suit, including reasonable attorneys' fees.

**COUNTERCLAIM COUNT III**
**(Unlawful Asset Acquisitions in Violation of Section 7 of the Clayton Act)**

79.     Toshiba repeats and re-alleges the allegations of the preceding Paragraphs of these Counterclaims as if fully set forth herein.

80.     Section 7 of the Clayton Act provides that "[n]o person . . . shall acquire . . . assets . . ., where . . . the effect of such acquisition . . . may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Intellectual Ventures has violated Section 7 of the Clayton Act.

**A.      The Relevant Market**

81.     As previously alleged, the relevant market is the market for licenses to Intellectual Ventures' Semiconductor Portfolio, which Intellectual Ventures claims is comprised of 3,700+ patents that read on flash-memory, SoC, USB host controller, and hard-drive technology.

**B.     Intellectual Ventures Has Illegally Acquired Assets Within The Relevant Market**

82.     Intellectual Ventures has acquired more than 3,700 flash-memory, SoC, USB host controller, and hard-drive patents, which are assets under Section 7 of the Clayton Act. The effect of those patent acquisitions has been substantially to lessen competition, and to tend to create a monopoly, in the market for licenses to its Semiconductor Portfolio, which Intellectual Ventures claims is comprised of 3,700+ patents that read on flash-memory, SoC, USB host controller, and hard-drive technology.

83.     Intellectual Ventures acquired its Semiconductor Portfolio secretly, through shell companies. Other than revealing a small number of "representative" patents during its initial meetings with Toshiba, Intellectual Ventures did not disclose a significant number of its patent holdings to Toshiba until December 6, 2011, when it identified additional semiconductor-related patents. Intellectual Ventures used its 2,000 shell companies to fraudulently conceal its acquisition and ownership of the vast majority of patents in its Semiconductor Portfolio. Many of the patents in Intellectual Ventures' Semiconductor Portfolio remain concealed today.

**C.     Intellectual Ventures' Acquisitions Substantially Harm Competition And Create A Monopoly Within The Relevant Market**

84.     The intent to create a monopoly drives Intellectual Ventures' patent acquisitions. Intellectual Ventures acquires patents that command little value in the competitive marketplace because those patents are likely invalid and not infringed and there is little or no demand for them. Then Intellectual Ventures combines thousands of these patents, eliminating alternative licensing sources by acquiring them outright, to create a portfolio that enables Intellectual Ventures to impose costs and uncertainty on its targets in excess of the value of the constituent patents. Intellectual Ventures makes clear that its targets must pay a hold-up demand if they want to avoid repeated meritless litigation and uncertainty. Intellectual Ventures' market power does

not reflect the quality of the constituent patents in the portfolio, but the cost and uncertainty that Intellectual Ventures' strategic portfolio assertion can inflict on its target.

85.     Intellectual Ventures' acquisition of 3,700+ semiconductor patents has created a monopoly. Intellectual Ventures' acquisitions have not simply created a monopoly as an incidental side-effect—Intellectual Ventures specifically aims to achieve this result.

86.     Due to Intellectual Ventures' patent acquisitions, the price for a license to those patents is now far higher than it was before Intellectual Ventures purchased and aggregated them. The strategic exploitation of lock-in effects does not promote efficiency and is a traditional basis for monopolization and Section 7 claims. Similarly, before Intellectual Ventures' anticompetitive acquisitions, Toshiba could have obtained licenses to the patents in Intellectual Ventures' portfolio for much less than the hundreds of millions of dollars that Intellectual Ventures has demanded for just a time-limited portfolio license. Instead, Toshiba faces the supracompetitive prices that Intellectual Ventures now demands by laying claim to Toshiba's existing and substitute product designs.

**D.      Toshiba Has Been And Will Continue To Be Injured By Intellectual Ventures' Illegal Conduct**

87.     As a direct result of Intellectual Ventures' unlawful asset acquisitions, Toshiba has been injured in its business and property, as previously alleged. Toshiba's injuries are a direct result of the unlawful conduct engaged in by Intellectual Ventures and are injuries of the type the antitrust laws were intended to prevent.

88.     Section 4 of the Clayton Act, 15 U.S.C. § 15, entitles Toshiba to treble the amount of its actual damages attributable to Intellectual Ventures' unlawful acquisitions in an amount to be determined at trial, plus the cost of suit, including reasonable attorneys' fees.

89.     Section 16 of the Clayton Act, 15 U.S.C. § 26, entitles Toshiba to an injunction mandating divestiture or other disposition of Intellectual Ventures' unlawfully acquired patent assets and to an award of the cost of suit, including reasonable attorneys' fees.

### COUNTERCLAIM COUNT IV
### (Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act)

90.     Toshiba repeats and realleges each allegation above as if fully set forth herein.

91.     Intellectual Ventures has combined and conspired with others, including but not limited to Talon Research, LLC, to restrain trade and competition in the relevant market and to engage in patent hold-up in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The conspiracy restrains trade in interstate commerce.

92.     As part of its so-called ACE program, Intellectual Ventures agreed with Talon and others to take patents from Intellectual Ventures' Semiconductor Portfolio and assert them against companies that refused to succumb to Intellectual Ventures' direct hold-up demands. The conspirators intended their concerted "show of force" to reinforce Intellectual Ventures' reputation for effective hold-up, and is a naked restraint of trade with no efficiency benefits. On September 26, 2011, Intellectual Ventures transferred U.S. Patent No. 5,581,498 to its coconspirator, Talon, thus effectively sharing access to Intellectual Ventures' portfolio for offensive purposes. Merely four days later, on September 30, 2011, Talon served Toshiba with a summons for allegedly infringing the '498 patent. On information and belief, Intellectual Ventures assigned the '498 patent pursuant to an agreement with Talon that the latter would use it to sue Toshiba.

93.     Intellectual Ventures' concerted action has harmed Toshiba in its business and property as alleged above.

94.     Section 4 of the Clayton Act, 15 U.S.C. § 15, entitles Toshiba to treble the amount of its actual damages attributable to Intellectual Ventures' unlawful conspiracy in an amount to be determined at trial, plus the cost of suit, including reasonable attorneys' fees.

95.     Section 16 of the Clayton Act, 15 U.S.C. § 26, entitles Toshiba to an injunction preventing and restraining Intellectual Ventures' conduct in violation of Section 1 of the Sherman Act, and to an award of the cost of suit, including reasonable attorneys' fees.

## **RELIEF SOUGHT**

WHEREFORE Toshiba respectfully requests the following relief:

A.     That Intellectual Ventures' unlawful conduct be declared, adjudicated and decreed a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

B.     That Intellectual Ventures' acquisitions of flash memory, SoC, USB host controller, and hard drive product patents, used to hold-up Toshiba, be declared, adjudicated, and decreed a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

C.     That Intellectual Ventures' unlawful conduct be declared, adjudicated and decreed a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

D.     That Intellectual Ventures' asserted Semiconductor Portfolio, purportedly reading on flash memory, SoC, USB host controller, and hard drive technologies, including the Patents-in-Suit, be deemed unenforceable;

E.     That Intellectual Ventures be enjoined from offensively asserting its patents reading on flash memory, SoC, USB host controller, and hard drive technologies against Toshiba;

F.      That Toshiba recover damages against Intellectual Ventures, including incidental and consequential damages, in an amount to be determined and multiplied, to the extent provided by law;

G.      That Toshiba be awarded expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law; and

H.      That Toshiba be awarded such additional relief as the Court may deem proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Toshiba demands a trial by jury on all issues properly triable to a jury.

Dated: October 8, 2014

**Of Counsel**:

Mark D. Fowler (*Pro Hac Vice*)
Alan Limbach (*Pro Hac Vice*)
Timothy Lohse (*Pro Hac Vice*)
Brent K. Yamashita (Pro Hac Vice)
Aaron Wainscoat (*Pro Hac Vice*)
Carrie L. Williamson (*Pro Hac Vice*)
Saori Kaji (*Pro Hac Vice*)
Katherine Cheung (*Pro Hac Vice*)
**DLA PIPER LLP (US)**
2000 University Avenue
East Palo Alto, CA  94303-2215
Telephone:   (650) 833-2048
Facsimile:    (650) 687-1138
mark.fowler@dlapiper.com
alan.limbach@dlapiper.com
timothy.lohse@dlapiper.com
brent.yamashita@dlapiper.com
aaron.wainscoat@dlapiper.com
carrie.williamson@dlapiper.com
saori.kaji@dlapiper.com
katherine.cheung@dlapiper.com

Gerald T. Sekimura (*Pro Hac Vice*)
**DLA PIPER LLP (US)**
555 Mission Street, Suite 2400
San Francisco, CA  94105-2933
Telephone:   (415) 836.2576
Facsimile:    (415) 659.7476
gerald.sekimura@dlapiper.com

Brian Erickson (*Pro Hac Vice*)
**DLA PIPER LLP (US)**
401 Congress Avenue, Suite 2500
Austin, TX 78701-3799
Telephone:   (512) 457.7059
Facsimile:    (512) 721.2263
brian.erickson@dlapiper.com

**DLA PIPER LLP (US)**

    */s/ Denise S. Kraft*
Denise S. Kraft (Bar No. 2778)
Brian A. Biggs (Bar No. 5591)
1201 North Market Street, Suite 2100
Wilmington, DE  19801-3046
Telephone:   (302) 468-5700
Facsimile:    (302) 394-2341
denise.kraft@dlapiper.com
brian.biggs@dlapiper.com

*Attorneys for Defendants Toshiba
Corporation, Toshiba America, Inc., Toshiba
America Electronic Components, Inc. and
Toshiba America Information Systems, Inc.*

Kevin Hamilton (*Pro Hac Vice*)
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone:   (619) 699.2634
Facsimile:    (619) 764.6633
kevin.hamilton@dlapiper.com

Patrick Park (*Pro Hac Vice*)
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067-4704
Telephone:   (310) 595.3113
Facsimile:    (310) 595.3413
patrick.park@dlapiper.com

Daniel M. Wall (*Pro Hac Application Pending*)
Hanno F. Kaiser (*Pro Hac Application Pending*)
Alan Devlin (*Pro Hac Application Pending*)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone:   (415) 391-0600
Facsimile:    (415) 395-8095
dan.wall@lw.com
hanno.kaiser@lw.com
alan.devlin@lw.com